FRAGRANCE EXPRESS DOT COM, INC., f/k/a Growth Industries, Inc., Plaintiff,

v.

STANDARD & POOR'S CORP., Defendant.

No. 01 Civ. 358(GEL).

United States District Court, S.D. New York.

Aug. 22, 2003.

Leo W. Desmond, West Palm Beach, FL, and Brian P. Murray, Rabin Murray & Frank, LLP, New York City, for Plaintiff.

Saul B. Shapiro, and Clare F. Saperstein, Patterson, Belknap, Webb & Tyler, LLP, New York City, and Barbara E. Schlain, the McGraw–Hill Companies, Inc. (of counsel), for Defendant.

## OPINION AND ORDER

LYNCH, District Judge.

This case concerns the effect of the assignment of a duplicate CUSIP number to stock in plaintiff's company. A CUSIP number is a unique nine-digit number assigned to publicly-traded securities to identify securities for the clearing and settlement of trades. The defendant, which administers the CUSIP system, mistakenly assigned a pre-existing CUSIP number to plaintiff's securities, and plaintiff alleges that this error, which it discovered two

months after public trading in its stock had commenced, caused its stock to lose value irreparably. The defendant moves for summary judgment, proposing that even if its negligence is assumed for purposes of argument, the plaintiff has failed to present any evidence that the decline in plaintiff's stock price is attributable to the misassigned CUSIP number. For the reasons that follow, the defendant's motion to dismiss the Complaint will be granted.

## BACKGROUND

Except where otherwise indicated, the following facts are undisputed. The plaintiff, Fragrance Express Dot Com, Inc. ("Fragrance Express"), was organized in the late 1990s to engage in the on-line sale of perfumes. The predecessor of the present Fragrance Express was called Fragrance Express, Inc., a Florida company ("FEF"). On March 24, 1998, FEF consummated a reverse merger with Growth Industries, Inc., a Nevada corporation that had been approved by NASD to publicly trade its shares ("Growth"). As a result of that merger, FEF became a wholly-owned subsidiary of Growth.

About a week before the merger, Growth had changed its name from Frozen Assets, Inc. As a result of the name change, Growth applied to the CUSIP Service Bureau[1] for a new CUSIP number to identify the stock of the newly-named company. (Compl.¶ 9.) On March 18, 1998, the CUSIP Service Bureau told Growth that its new CUSIP number was 399884105.

After consummating the merger with FEF, trading in Growth shares began. On March 30, 1998, the first day a trade occurred, 1,000 shares of Growth stock were sold with a starting price of $3.675 per share. (Pl.Mem.7.) By the end of the day, the stock price had dropped to $1.

(Def.Mem.11.) By May 27, 1998, the share price had declined to less than $0.13; it never substantially recovered. (Pl. Mem.21.)

In late May, the plaintiff learned that the CUSIP number assigned to Growth was not a new and unique number, as it was supposed to be. (Compl.¶ 17.) Rather, the CUSIP Service Bureau had mistakenly assigned Growth the number already issued to an unrelated, defunct Nevada company which had also been called Growth Industries, Inc. ("Old Growth"). On June 12, 1998, Growth publicly disclosed that it had been issued a duplicate CUSIP number. (Pl. Mem. 21; Declaration of Clare F. Saperstein, dated Feb. 28, 2003 ("Saperstein Decl."), Ex. 29.) On June 22, 1998, the CUSIP Service Bureau assigned a new CUSIP number to Growth, which by then had changed its name to Fragrance Express, Inc., a Nevada corporation ("FEN"). By March 18, 1999, the plaintiff company again changed its name to Fragrance Express Dot Com, Inc. The price of stock in the plaintiff company never rose above $1 per share after the first day of trading.

The significance of the duplicate CUSIP number lies in the mechanics of a stock trade. The Depository Trust Company ("DTC") is a national clearinghouse for securities traded by brokerage firms on the public markets. (Def. 56.1 Stmt. ¶ 83.) Stock certificates in DTC's possession reflect shares held in brokerage firm accounts, identified by CUSIP number. DTC maintains records of each brokerage firm's position in a particular security, and the brokerage firm keeps records of the trading activity of those shares.

The parties agree that by May 29, 1998, DTC had 2,902,200 shares on deposit with

1. The CUSIP Service Bureau is operated by Standard & Poor's, a division of The McGraw–Hill Companies, Inc., incorrectly sued here as Standard & Poor's Corp., and holds the exclusive license to issue CUSIP numbers.

CUSIP number 399884105. (Pl. Mem. 19; Declaration of Leo W. Desmond, executed March 28, 2003 ("Desmond Decl."), Ex. 6.) Of that number, at least 92,100 shares (about 3%) were shares of defunct Old Growth stock bearing the same CUSIP number as the Growth shares. (Pl. 56.1 Stmt. ¶ 3, Def. Rep. 56.1 Stmt. ¶ 3.) The parties agree that during the time Growth shares were on the market, a seller called RAF Financial Corporation ("RAF") sold 5,700 shares of Old Growth stock held at DTC, even though Old Growth was a defunct company. (Pl. 56.1 Stmt. ¶ 5.) The first sale of Old Growth shares occurred on April 13, 1998, and subsequent sales occurred on April 15, 1998, and April 22, 1998. (Def. 56.1 Stmt. ¶ 89.) These sales were apparently facilitated by the posting of Growth shares to the market, since those shares had the same company name and CUSIP number.

While the parties do not dispute these facts, they do dispute the effect of the presence in the DTC inventory of defunct Old Growth shares bearing the same CUSIP number as newly-posted Growth shares. In the Complaint, the plaintiff alleged that Old Growth shareholders believed that their stock had been posted to trade again since stock with the identical CUSIP number had been posted, and proceeded to flood the market with worthless Old Growth stock, thus driving down the price of Growth shares. (Compl.¶ 17.) After discovery revealed the extremely small number of Old Growth shares actually traded, the plaintiff largely abandoned this theory. In opposition to the summary judgment motion, the plaintiff argues instead that Old Growth shares were "commingled" with Growth shares in DTC's inventory, resulting in rumors within the investment community that Growth shares were diluted. The plaintiff claims that investor confusion resulting from two companies using the same CUSIP number caused the irreparable collapse of the Growth stock price. (Pl.Mem.7.)

The defendant offers evidence, and the plaintiff does not dispute, that a total of 2,368,512 trades of stock with CUSIP number 399884105 were made on the public markets during the time Growth stock was posted to the market. (Def. 56.1 Stmt. ¶ 95.) Of those trades, the parties agree that 5,700—less than two-tenths of one per cent—involved shares of Old Growth stock. (Def. Mem. 14; Pl. 56.1 Stmt. ¶ 23). The plaintiff cites no evidence to contradict the conclusion that the vast majority of shares traded were Growth shares.[2] Long before the first Old Growth shares were traded on April 13, 1998, the price of Growth shares had dropped below $1 per share. (Def.Mem.15.) The plaintiff now contends that the damage to Growth was not in the number of Old Growth shares traded, but rather in the existence of the Old Growth stock in the DTC inventory. Plaintiff argues that the presence of Old Growth stock led to rumors in the financial community that inhibited marketmakers from buying any Growth stock at all, and made it impossible for Growth to make appointments with retail brokers to promote the stock. (Pl.Mem.7.)

### DISCUSSION

#### A. Standard for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and when, viewing the evi-

---

**2.** The defendant's expert report states that after accounting for the 3,500 shares that RAF repurchased, only 2,200 Old Growth shares were net sold into the market, constituting about 2% of a total of 104,800 shares with CUSIP number 399884104 net sold. (Def. Mem. 14, citing Ex. 11 to Amended Expert Report of Marcia Kramer Mayer, dated Nov. 26, 2002, Ex. 3 to Saperstein Decl.) Whether net or gross figures are considered, the evidence demonstrates minimal sale of Old Growth stock.

dence in a light most favorable to the nonmoving party, no reasonable trier of fact could disagree as to the outcome of the case. *See Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 45 (2d Cir.2000). While all ambiguities in the evidentiary record must be resolved in favor of the nonmoving party, "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). In addition, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is then appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

To establish a genuine issue of material fact, the party opposing summary judgment " 'must produce specific facts indicating' that a genuine factual issue exists." *Scotto*, 143 F.3d at 114 (quoting *Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir.1998)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted).

Moreover, if there is an absence of evidence on an essential element of the claim, and if at trial the nonmoving party would have the burden of proof of that essential element, then summary judgment is warranted. This is because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

**B.  *Application To This Case***

■■■■ The plaintiff claims that the defendant's negligence in assigning a duplicate CUSIP number caused plaintiff's stock price to drop. To prevail on a claim of negligence, a "plaintiff must show that the defendant owed the plaintiff a cognizable duty of care, that the defendant breached that duty, and that the plaintiff suffered damages *as a proximate result of that breach.*" *King v. Crossland Savings Bank*, 111 F.3d 251, 259 (2d Cir.1997) (emphasis added). If, after discovery, the plaintiff fails to demonstrate evidence in its favor on any one of the above elements, then summary judgment must be granted to the defendant, because the plaintiff must prove each of the elements in order to prevail at trial.

Courts rarely grant summary judgment in negligence cases, because the reasonableness of a defendant's conduct is generally a factual question to be determined by a jury. *Id.* Here, however, the defendant does not base its motion on a claim that it was not negligent, but rather on lack of proof of causation. Where a plaintiff fails to present a sufficient question of fact as to whether alleged negligence caused loss, summary judgment will be awarded. *See Ansam Assoc., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446–447 (2d Cir.1985) (affirming dismissal of negligence claim on summary judgment where plaintiff offered

only conjecture in support of theory of causation). The defendant argues that even conceding (for purposes of this motion) that it owed plaintiff a duty and breached that duty by assigning a duplicate CUSIP number, the Complaint should still be dismissed because the plaintiff has failed to show that the duplicate CUSIP number caused the decline in value of plaintiff's stock. Because the plaintiff has failed to present any evidence from which a reasonable jury could find that the duplicate CUSIP number caused plaintiff's stock price to decline, summary judgment will be granted to the defendant.

### 1. Trades in Old Growth Shares

Plaintiff does not dispute that out of a total of 2,368,512 shares of stock traded bearing the CUSIP 399884105, only 5,700 were shares of Old Growth. Rather than take issue with the actual trades that occurred, the plaintiff offers a confusing and irrelevant description of the shares on deposit at the DTC, and how that number may have fluctuated between February and May 1998. Nevertheless, it is undisputed that of the shares actually traded, only a very small fraction were Old Growth shares. Moreover, by the time the first Old Growth shares were traded on April 13, 1998, the price of Growth shares had already declined to $1 per share, negating any inference that a flood of Old Growth shares was responsible for the price drop. The plaintiff's original theory of causation is therefore defeated, because the market was clearly not flooded with Old Growth shares sufficient to drive down the price of Growth shares.[3]

### 2. Rumors of Diluted Growth Stock

Plaintiff offers no evidence to support its alternative theory, relied on in its summary judgment papers, that market rumors of the existence of additional, undisclosed stock caused Growth's stock price to plummet. Plaintiff speculates that the commingling of Growth and Old Growth stock in DTC's inventory was the source of speculation in the market that there existed more Growth stock for sale than the company had disclosed, and that as a result marketmakers were reluctant to invest in the stock or meet with Growth promoters. (Pl.Mem.20.) However, plaintiff offers no testimony of any independent market participant or observer to support this assertion. In support of the theory that rumors of diluted Growth stock permeated the market, the plaintiff provides only hearsay testimony by interested parties. Ken Barker, a Growth principal, testified at his deposition that marketmakers were concerned about the existence of undisclosed shares and acted accordingly (Deposition Transcript of Ken Barker, dated Oct. 10, 2002, at 95, 121, 151, Ex. 7 to Desmond Decl.), but no first-hand testimony of any marketmaker is offered in support of this assertion. The plaintiff also offers the affidavit of a Growth promoter who avers that there were rumors of millions of undisclosed trades (Affidavit of Kevin Murphy, dated March 27, 2003, ¶¶ 5–9, Ex. 9 to Desmond Decl.), but again there is no other evidence that the rumors existed or any evidence whatever that such rumors caused the lack of interest in Growth stock.[4] Barker's and Murphy's

---

**3.** The plaintiff's own expert conceded as much at his deposition, when he agreed that the available evidence demonstrated that only 2,200 Old Growth shares had been net sold, and proceeded to state that the only way the Growth stock price could have been affected by the Old Growth shares was if the market "realization [grew] that there are these shares

out there." (Deposition Transcript of Michael A. Marek, dated December 4, 2002 at 35, Ex. 53 to Saperstein Decl.)

**4.** Plaintiff's expert, Marek, testified that he was aware of no evidence, beyond Barker's deposition testimony, that any market participants were aware of the duplicate CUSIP

testimony as to why third parties did not purchase Growth stock are at best hearsay, and at worst sheer speculation. If the rumors did exist and have such effect, affidavits or depositions of the marketmakers or other potential investors, some of whom are named in the Barker deposition excerpts submitted upon summary judgment, could have provided the requisite evidence. As it stands, there is no evidence of a causal connection between the misassigned CUSIP number, any rumors that may have circulated, and any actions taken or not taken by brokers or potential investors.

The parties agree that as of May 29, 1998, DTC held 2,902,200 shares with CUSIP number 399884105, at least 92,100 of which were Old Growth shares. (Pl. 56.1 Stmt. ¶ 17; Def. Reply 56.1 Stmt. ¶ 17.) However, the parties dispute the exact number of Old Growth and Growth shares on deposit at DTC, and offer conflicting calculations of the number of such shares on deposit.[5] Plaintiff belabors this point in its brief, apparently with an eye to demonstrating the extent of commingling of Growth and Old Growth shares. However, since plaintiff has failed to produce any evidence of damaging rumors, the extent of commingling is irrelevant. According to plaintiff's own theory of causation the question is not the extent of any commingling, but rather who knew or suspected that there was a possible dilution of Growth shares. The plaintiff's rambling catalogue of stock sales seems intended to create the impression of disputed material

facts, when in reality the essential facts are uncontested. While there may be confusion in plaintiff's papers, there does not appear to have been confusion in the market, because there is no evidence that any market actor knew or suspected that there was potentially more stock for sale than Growth had disclosed and took action based on such suspicion.

In contrast to the plaintiff's entirely speculative theory of causation, defendant presents uncontested facts that provide a convincing explanation for the decline in plaintiff's stock price, rooted in the underlying weakness of plaintiff's venture. Defendant's argument on causation can be considered on summary judgment, because "a convincing presentation by the moving party" cannot be overcome by "the mere possibility that a factual dispute *may* exist." *Ansam,* 760 F.2d at 447 (emphasis in original).

Even putting aside the defendant's extended discussion of the checkered past of plaintiff's principals and financial backers, given Growth's high-risk financing arrangements and the questionable prospects for on-line fragrance sales at a minimum, there is no reason to assume that the plaintiff company was destined for success, or that the market incorrectly valued the stock by assigning it a lower price than plaintiff's backers had hoped for. As already noted, plaintiff's share price had already declined precipitously before any confusion about the CUSIP number could have ensued. Moreover, the price did not

number prior to the company's public disclosure on June 12, 1998. (*Id.* at 36.)

**5.** The plaintiff suggests in its Rule 56.1 Statement that the DTC may have held "more than one million [Old Growth] shares" (while failing to provide any evidence in support of this assertion) (Pl. 56.1 Stmt. ¶ 13), and states in its brief that there may have been as many as 163,000 Old Growth shares on deposit at DTC

by May 29, 1998. (Pl. Mem. at 19–20.) However, even assuming that this is correct (which the defendant disputes), it is not material. The plaintiff does not allege that more than 5,700 trades of Old Growth stock actually occurred (Pl. 56.1 Stmt. ¶ 23), and as explained below, the amount of commingled stock in the DTC inventory is irrelevant absent evidence that the market suspected a dilution of Growth stock.

recover after any possible confusion had been cured. As the defendant argues, it is an elementary principal of economics that markets respond to information. If were true that market rumors about the existence of additional, undisclosed shares injured Growth's stock price, then the market should have corrected the price once more accurate information became available. No such market correction occurred, and Growth's stock price did not recover even after the company publicly recognized the error and received a new and unique CUSIP number.

Like many start-up companies, the plaintiff failed to attract investors and did not live up to its principals' expectations after it began publicly trading shares. Plaintiff cannot recoup its losses by capitalizing on the misassignment of the CUSIP number, because there is no evidence that the CUSIP number had anything to do with the market's lack of interest in plaintiff's venture. Summary judgment will be awarded to defendant, and the Complaint will be dismissed, because no reasonable jury could find for the plaintiff on its claim of negligence when the plaintiff has failed to produce any evidence to support its theory of loss causation.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is granted, and the Complaint is dismissed.

SO ORDERED.